E. I. Du Pont de Nemours and Company,
Plaintiff-Appellant,

*vs.*

George R. Clark, S. Gilbert Pierce, Elwood S. Leach, Levy Court Commissioners of New Castle County, Albert B. Connor, Plumbing Inspector for New Castle County and John F. Tidwell, Building Inspector for New Castle County,

Defendants-Appellees.

*Supreme Court, On Appeal, May 5, 1952.*

WOLCOTT and TUNNEL, Justices, and HERRMANN, Judge, sitting.

*Hugh M. Morris* and *George T. Coulson,* of Morris, Steele, Nichols and Arsht, for appellant.

*William S. Satterthwaite* and *Clarence W. Taylor,* for appellees.

WOLCOTT, Justice, delivering opinion of majority of the court:

This is an action for a declaratory judgment to the effect that a building being erected by the appellant on its property in Mill Creek Hundred, New Castle County, is property to be used for industrial purposes and, as such, exempt from the provisions of the Plumbing and the Building Codes of New Castle County. Upon the filing of the amended complaint, the appellees and their agents were restrained from demanding that the appellant obtain permits under the codes in connection with the construction of its building.

The appellees moved to dismiss the complaint and to dissolve the restraining order. After final hearing, the Vice Chancellor entered a judgment dissolving the restraining order and dismissing the action. (*See ante. p.* 313, 85 *A.2d* 721.) From this judgment the appeal has been taken.

The motion to dismiss necessarily admitted the truth of the allegations of the amended complaint. The following facts, therefore, may be taken as established for the purposes of this appeal.

The appellant, a Delaware corporation, is extensively engaged in manufacturing and selling chemical products throughout the United States and in foreign countries, and is, generally speaking, engaged in the industrial chemical business. In order to further the objects and purposes of its business, it is essential that the appellant provide laboratories, factories, warehouses, and office buildings for the use of its executive, clerical, technical and other employees. The functions performed by its employees of all categories are each indispensable to and indissoluble from the appellant's activities in the chemical industry.

The particular building of the appellant sought by the appellees to be made subject to the provisions of the Building and the Plumbing Codes of New Castle County is an office building now under construction, not for sale, but for the use of the appellant's Engineering Department in connection with its functions in the appellant's business.

Upon the basis of these facts, appellant contends that its property involved in this cause falls within two of the exemptions provided for in the enabling statutes under which the Building and the Plumbing Codes were promulgated by the Levy Court of New Castle County.[1]

In so far as they are pertinent to the cause *sub judice* the statutes are similar. We are concerned only with the exemption provisions found in both since the appellant seeks to bring itself within two of those exemptions. Each statute contains five exemptions or exceptions of properties from its provisions. These are substantially as follows:

(1) Structures necessary to the operation of farm lands;

(2) Properties located within any incorporated city or town;

---

[1] The present Building Code Act, as amended, is found in *Vol.* 44, *Laws of Delaware, Ch.* 84, and *Vol.* 45, *Laws of Delaware, Ch.* 111. The Plumbing Code Act, as amended, is found in *Vol.* 44, *Laws of Delaware, Ch.* 83, and *Vol.* 45, *Laws of Delaware, Ch.* 112.

(3)   Properties used for industrial purposes;

(4)   Properties built by industrial concerns for the use of their employees and not for sale;

(5)   Properties owned by individuals who desire to do their own work.

Appellant argues that the building it is now constructing is exempt from the provisions of the codes by reason of exemptions numbered 3 and 4. We will first consider Exemption No. 3.

Appellant argues that the adjective "industrial" means having to do with, pertaining to, relating to or connected with production, industry or the manufacture of commodities and, as such, has a sufficiently broad meaning to embrace any property of an industrial concern used in connection with its business generally.

Appellees argue that the adjective "industrial," as used in the acts under consideration, is synonymous with "manufacturing" and that Exemption No. 3 covers only buildings and properties actually used in a manufacturing process. Broadly speaking, appellees contend that only factories are included in Exemption No. 3.

The decisions to which we are cited by both sides are not dispositive of the question. We are referred to language appearing in opinions dealing with somewhat comparable problems of statutory construction in which the words "industrial" or "industry" or "manufacturing" are defined. We do not think these cases are particularly helpful in the solution of the problem with which we are faced except that they indicate the lack of preciseness in the definition of the word "industrial" and the consequent need for the resolution of an apparent ambiguity in the exemptions contained in the statutes. The most that can be said for the authorities to which we have been cited on this point is that they demonstrate that under some circumstances the word "industrial" may mean pertaining to all facets of an industry, and that,

under other circumstances, it may mean only the actual process of manufacture carried on in a factory. We think it plain that the scope of the exemption may not be determined solely by reference to a dictionary.

We are faced, therefore, with the necessity of construing the exemptions in the two statutes before us. In so doing, we are required to give to the statutory words a reasonable and sensible meaning in the light of their intent and purpose. *Petition of Hoopes,* 1 *Terry* 126, 5 *A.2d* 655; *Darling Apartment Co. v. Springer,* 25 *Del.Ch.* 420, 22 *A.2d* 397, 137 *A.L.R.* 803. The object of statutory construction is to give, if possible, a sensible and practical meaning to a statute as a whole so that it may be applied in future cases as well as the present one without difficulty. The court must necessarily be guided by the presumption that the Legislature did not intend an unreasonable, absurd or unworkable result. If from the statute as a whole the object sought to be attained or the general intent underlying the statutory language can be ascertained, it will be given effect by the courts. *Darling Apartment Co. v. Springer, supra.*

In determining the meaning of ambiguous statutory language, an appreciation of the results which may follow from one possible construction or another may, on occasion, be conclusive as to the correct construction to be placed upon the language, since an irrational, impractical or excessive result presumably could not have been intended by the Legislature. *Roland Park Co. v. State,* 80 *Md.* 448, 31 *A.* 298; *Commonwealth v. Peoples,* 345 *Pa.* 576, 28 *A.2d* 792; *People's Holding Co. v. Bray,* 118 *Conn.* 568, 173 *A.* 233; *St. Paul's Church v. City of Concord,* 75 *N.H.* 420, 75 *A.* 531, 27 *L.R.A.,* (*N.S.,*) 910. Since exemptions no less than other portions of a statute are entitled to the application of the rule of reasonable construction, a particular construction of an exemption will be adopted when such construction appears to be the only reasonable one in accordance with the underlying legislative intent which will give a fixed, permanent and certain

rule easily applied to future cases. 50 *Am. Jur., Statutes,* § 431; *Langdon v. Doud,* 6 *Allen, (Mass.,)* 423.

■    Appellant argues that the statutes under consideration are in derogation of its common-law right to the free and unhampered use of property and, therefore, should be strictly construed so as to narrow their application, while appellees argue that the statutes are designed to promote the health and safety of the public and that, accordingly, the statutes as a whole should be liberally construed and the exemptions confined in their operations as narrowly as possible. We think neither the so-called rules of strict or liberal construction are of much aid in the problem before us. Whatever the nature of the statute under construction may be, the primary object of construction is to reach a result in conformity with the supposed policy of the statute. Once the policy of the statute is determined, the task of construction is eased for the result then need only be tested by the rules of reasonableness and conformity with the policy of the statute.

It is difficult to arrive at any completely satisfactory conclusion with respect to the precise intent with which the Legislature included the exemptions we are concerned with. Since the enabling acts are designed to promote the public health and safety, it is difficult to ascribe any reason to the exclusion of industrial properties for it would be unreasonable to assume that they do not affect the public health and safety and, therefore, need not be required to conform to the general plumbing and building standards presumably designed to safeguard the public health and safety. Since, obviously, properties used for industrial purposes can affect the public health and safety as well as properties not used for industrial purposes, some other reason must have led to the exemption of such properties from the operative effect of the codes adopted pursuant to the authority contained in the statutes exempting this type of property.

The most rational explanation that can be placed upon

exemption of properties used for industrial purposes is that the exemption is designed to favor industry and, thus, attract it to New Castle County on the theory that the industrial growth of the county would benefit the community. Such a policy is not novel in this state. The Legislature has long provided for exemption from county taxation of property located in certain designated areas "upon which any manufacturing or other industrial improvements for the employment of labor shall be erected." 1935 *Code,* § 1258. The Council of the Town of Delmar, by 45 *Laws of Del., Ch.* 182, *Sec.* 14, ¶6, is authorized to exempt from taxation "any industry which contemplates locating within said Town," provided the number of its employees shall warrant such an exemption. The Council of the City of New Castle is authorized, by 37 *Laws of Del., Ch.* 163, to remit taxes levied upon real estate upon which "any new manufacturing or other industrial improvements for the employment of labor" shall be or have been erected. The same authority is conferred upon the Town Council of Georgetown, by 25 *Laws of Del., Ch.* 202, *Sec.* 1, ¶2, and by 36 *Laws of Del., Ch.* 192, *Sec.* 15, the Town Council of Smyrna is authorized to exempt from taxation real and personal property "used in any manufacturing business * * * employing not less than six persons." Other instances of the favoritism shown industrial establishments can be cited,[2] but the foregoing suffice to show the practice of the Legislature in this respect.

With this policy of the Legislature in mind, it re-

---

[2] E. g., 18 *Laws of Del., Ch.* 161, *Sec.* 21 (Town of Milford); 18 *Laws of Del., Ch.* 175, *Sec.* 31 (Town of Newark); 19 *Laws of Del., Ch.* 746, *Sec.* 28 (Town of Dover); 24 *Laws of Del., Ch.* 195, *Sec.* 3, ¶2 (Town of Newport); 24 *Laws of Del., Ch.* 199, *Sec.* 18 (Town of Delaware City); 24 *Laws of Del., Ch.* 209, *Sec.* 18 (Town of Harrington); 33 *Laws of Del., Ch.* 128, *Sec.* 12 (Town of Middletown); 33 *Laws of Del., Ch.* 131, *Sec.* XXVIII (Town of Clayton); 43 *Laws of Del., Ch.* 159, *Sec.* 21 (Town of Camden); 43 *Laws of Del., Ch.* 161, *Sec.* 21 (Town of Dagsboro); 43 *Laws of Del., Ch.* 184, *Sec.* 28, ¶2 (City of Seaford); 43 *Laws of Del., Ch.* 189, *Sec.* 21 (Town of Wyoming); 45 *Laws of Del., Ch.* 182, *Sec.* 14, ¶6 (Town of Delmar).

quires no great effort to reach the conclusion that the same policy dictated the exemption of properties "used for industrial purposes" from the operation of the Building and Plumbing Codes. It cannot be urged in opposition to this conclusion that the exemption does not relieve against any real burdens. A reading of the Building and Plumbing Codes is sufficient to show that relief from their manifold requirements, inspections and permit necessities would be a favor. Furthermore, the permit fees in this cause would amount to a total of $7,861.50. In any event, we are not concerned with the wisdom either of the enactment of the enabling statutes themselves, or of the inclusion within them of exemptions. It is sufficient for us to conclude that the exemptions we are concerned with are evidently intended to be an inducement or the conferring of a favor. We think that this establishes the legislative policy behind the exemptions.

Since the apparent policy embodied in the exemptions is that of attracting industry, we do not think that we would be justified in unduly restricting or qualifying by judicial interpretation this invitation. We cannot believe that the Legislature intended to invite factories only to Delaware. The Legislature must have considered the other components of a modern industrial concern to be as beneficial to the local community as the factory itself. This being so, we think the proper construction of the phrase "properties used for industrial purposes" should be that the phrase includes all properties of an industrial concern essential and indispensable to and indissoluble from the industrial operations of the concern. Obviously, under the state of the pleadings before us, the building being constructed by the appellant for the use of its Engineering Department falls within this definition.

It is suggested that it is as consistent with reason to conclude that the exemption of properties used for industrial purposes was included in the statutes under consideration as a means of overcoming opposition to the passage of the enabling legislation. We hesitate to ascribe such a motive to the Legislature in the absence of clear evidence that such was

the actual fact, but we think that if that were the fact the result is the same. If opposition to the legislation by industry had attained such formidable proportions as to threaten defeat of the statutes, it would seem likely that such opposition could have been overcome only by complete exemption of the properties used in the industry. Therefore, if this view of the purpose behind the exemption is held, the exemption must, in the light of the legislative intent, or, more accurately, bargain, be held to embrace all the properties of an industrial concern essential to its operation.

This conclusion is to be tested by the rule of statutory construction to the effect that one of two different constructions will be adopted if it will lead to a more reasonable result as far as future application of the statute is concerned than would the other. To limit the application of Exemption No. 3 purely to properties used in the actual process of manufacturing would lead to difficulty in the future administration of the law. Obviously, under such an interpretation a factory building used for nothing else would be exempt. In the event, however, the question of exemption or nonexemption concerned a wing to be added to such a building to contain offices for executive personnel in connection with the plant operation, difficulty would be experienced in determining whether such wing as an appendage to a factory was exempt or was to be considered as a separate structure subject to the provisions of the codes. Variations from one extreme to the other can be thought of which would make the problem of administration even more difficult. For example, whether or not to exempt or include buildings to house laboratories for the testing of raw or finished materials, garages for the storage of trucks used to deliver the finished product, warehouses, loading platforms on railroad sidings, or other establishments closely related to but not integrally an indispensable part of the conversion of raw materials to finished products, would present many perplexing problems depending for their solution on the resolving of difficult factual questions; and in the last analysis could easily result in

arbitrary and capricious determinations of exemption or non-exemption.

In view of the difficulties of administration of the law that would be inherent in an adoption of the construction urged by the appellees, we are constrained to hold in line with the authorities we have referred to and with the legislative policy concerning the exemptions, that the building now being constructed by the appellant for the use of its Engineering Department is a property used for inudstrial purposes within the meaning of Exemption No. 3.

The result we have reached with respect to the proper construction to be given Exemption No. 3 finds added support from the proper meaning of Exemption No. 4, which appellant argues also exempts its property. We do not agree with the appellant's argument in this respect, but we think that the two exemptions necessarily must be considered together. Each clarifies the meaning of the other.

Exemption No. 4 exempts properties built by industrial concerns for the use of their employees and not for sale. The Vice Chancellor concluded that the exemption applied only to properties constructed by industrial concerns for the use of their employees from which use the employees themselves derive some enjoyment or benefit. He held that the use referred to in this exemption was not use for the benefit of the company but for the benefit of the individual employees.

We agree with the conclusions of the Vice Chancellor with respect to the proper construction of the language of Exemption No. 4. "Use," as defined in *Webster's New International Dictionary, Second Edition,* contains connotations of deriving personal benefit or service by the user himself, and in 2 *Bouvier's Law Dictionary, (Rawle's 3rd Rev.) page* 3380, a "user" is defined as one who enjoys a thing. This being so, it seems obvious that Exemption No. 4 was intended to apply to properties made available by an industrial concern for the personal use and enjoyment of its employees. For example, country clubs or housing units erected by an

industrial concern for the personal use of its employees might fall within the exemption under consideration.

We do not think this construction of Exemption No. 4 conflicts with the conclusion we have reached with respect to Exemption No. 3, which exempts properties used by an industrial concern for purposes indispensable to and indissoluble from its industrial activities. There is doubt whether properties owned by an industrial concern and made available to its employees for their personal use and benefit would fall within Exemption No. 3. It is at least doubtful whether the latter type of properties does more than fall upon the periphery of the sphere of Exemption No. 3. Hence, it would seem obvious that the inclusion of Exemption No. 4 was made because of the realization by the Legislature of this doubt.

The combined result of Exemptions Nos. 3 and 4 is, therefore, to exempt all of the property of an industrial concern used in furtherance of its general business purposes, whether the use of the particular property is indispensable to and indissoluble from the company's industrial activities, or, whether the use is designed to promote friendly employee relationships and, thus, indirectly further the welfare of the company.

If this construction of the two exemptions is tested by the rule of reasonableness of result, its correctness is demonstrated. If the contrary view with respect to Exemption No. 3 is adopted, the combined effect of the two exemptions is indefensible under any theory as a reasonable result for the Legislature to have intended. If appellees' view is accepted, then only that property of an industrial concern directly used in connection with an actual process of manufacture, or used for the personal enjoyment of the company's employees would be exempt from the provisions of the codes. This result cannot be explained on the theory that it promotes public health and safety since the classification made with respect to the varied types of the corporation's property bears

no reasonable relation to safeguarding health and safety. Nor, on the other hand, is such result reasonable in the light of the apparent purpose of the exemptions, viz., the favoring of industry over other types of business, since such an irrational classification of the industrial concern's property would offer little in the way of an inducement to industry seeking to locate in New Castle County and desiring initially to knów its exact position under various regulatory laws. In seeking to make such a determination, the industrial concern would be faced with the same difficulties of application of the exemptions as would be encountered in the actual administration of the law.

We are faced with the necessity of choosing between two alternatives which produce two different results. We prefer that result making an effective exemption of all industrial property. It is easy of administration and is a furtherance of what appears to be the underlying legislative policy. It is therefore a reasonable and rational construction to be placed upon the exemptions. We reject the result urged by appellees which would be the exact contrary. Under it, the administration of the law in the future would be difficult, and furthermore the classification of industrial concerns' property of varied types would appear to be arbitrary and based upon no reasonable connection between the property, the industry, and the expressed purpose of the statutes. Under such circumstances, and faced with the necessity of choosing one of two results as the one intended by the Legislature, we prefer to accept that one which appears more likely to have appealed to the legislative mind as reasonable.

For the reasons set forth in the foregoing, the judgment of the Vice Chancellor dismissing the cause and dissolving the restraining order will be reversed and the cause remanded with instructions to take further proceedings in conformity with this opinion.

TUNNELL, Justice (dissenting) :

I agree with the majority that this is one of those un-

fortunate instances in which the key statutory word is ambiguous. It falls upon the courts, therefore, making use of the principles of logic and law, but scrupulously avoiding considerations lying within the province of the Legislature, to resolve the ambiguity. The specific question is whether the word "industrial" was here used in the narrow sense its derivation suggests, simply relating to manufacture, or in its much broader sense, including all the allied and incidental activities in which a manufacturing concern may engage.

The correct interpretation to be put upon ambiguous statutory language is commonly indicated by the nature and purpose of the legislation involved. Modern courts still observe this basic principle of construction, which was described by Lord Coke in 1584 in the following words:[3]

> "And then the office of all the judges is always to make such construction as shall suppress the mischief, advance the remedy, and to suppress subtle invention and evasions for continuance of the mischief, and *pro privato commodo*, and to add force and life to the cure and remedy, according to the true intent of the makers of the act *pro bono publico*."

The avowed purpose of one of the statutes here involved, and the clearly evident purpose of the other, is to protect the health and safety of the public. They, therefore, lie within a generally recognized field of legislation usually referred to as "laws for advancement of the public welfare." The courts have uniformly declared themselves bound to construe the language of such statutes liberally, so as to effect the humanitarian legislative intent to the fullest reasonable extent. 50 *Am. Jur.*, 420; *Southerland, Statutory Construction (3rd Ed.) Horack, Secs.* 6604, 7201, 7202. A corollary to this rule of liberal construction, which actually amounts only to its inverse statement, is that any provisos, exemptions or exceptions to the coverage of such laws must be strictly construed. 50 *Am.Jur.*, § 458; *Crawford, Statutory Construction*, § 299, *p.* 609; *McComb v. Consolidated Fisheries Co., (D.C.Del.,)* 75 *F. Supp.* 798, *affirmed* 3 *Cir.*, 174 *F.2d* 74.

---

[3] *Heydon's Case, 3 Co. Rep. 7a, 76 Eng. Rep.* 637 (638).

Any person asserting the protection of an exception, therefore, must carry the burden of proof and establish to the satisfaction of the court that he is clearly excluded by the language on which he relies. *Detroit Edison Co. v. Securities and Exchange Comm.,* (6 *Cir.*) 1941, 119 *F.2d* 730, 739; and see, for example, such cases as are collected in *Note* 67, *Title* 29, *U.S.C.A.* § 213.

For reasons which seemed sufficient to the General Assembly, the necessity to protect health and safety was set aside in certain cases where it was thought to conflict with the interests of industry. That decision was made in the exercise of the legislative function. But the extent to which health and safety were thus set aside was limited by a word which can be taken in either of two senses. Therefore, owing to the nature of the reason for enactment of the statutes, it is a judicial responsibility to be certain that the curtailment of the application of the statutes is no more severe than the General Assembly clearly directed it to be.

Now the proposed use of this building is for offices. Accordingly, if we apply the above-stated rule, we must hold that an office building is not one used for "industrial" purposes.

The majority opinion holds that the exceptions must be broadly construed because of what it says the Legislature must have had in mind when the language was adopted. The intent, it says, was to favor industry. Hence, it reasons, the best way to carry out the legislative intent is to favor industry as far as possible. This process of reasoning confuses the character of an intent with its *quantum.* Because there was an intent to help industry to some extent, it does not follow that the intent was to help it to the very limit of possibility.

It is suggested specifically that reason indicates that the purpose of the two instant exceptions was to attract new industry into New Castle County. But is this reasoning of rationalization? It could be that the actual legislative intent was to assure the passage of the bill, and thus to pacify the

industry which was already located in New Castle County. But in any case, I perceive no established principle which would prompt us to speculate, as the majority opinion has done, upon the type of bargain which would be presumed to have been sufficient to placate the representatives of industry at Dover.

But, putting aside our entire first analysis of the problem, based upon the general purpose of the statute, let us briefly consider just the exceptions. Whether they were inserted into the law in order to bring new industry into New Castle County, which I do not deny, or to overcome opposition to the statutes, which I do not assert, or to accomplish some entirely different purpose of which the court has no knowledge, all must agree upon this, that, as stated by the majority, the exceptions were "intended to be an inducement or the conferring of a favor." This granting of a favor is a familiar type of legislation euphemistically referred to as "public grants," but which might more accurately be termed "private grants." Exclusive franchises and conveyances of public lands are such grants. The majority opinion notes another example, where it cites numerous instances in which our state has permitted various of its governmental subdivisions to exempt new concerns, usually for a limited time, from the payment of property tax. To the majority the allowance of so many of these tax exemptions seems to demonstrate that our jurisdiction has in some blanket fashion approved and encouraged the principle of such favors, and, therefore, has placed a duty upon the courts to construe any ambiguous terms in that type of legislation in such manner as further to favor the already favored class or group. I can in no sense agree. Borrowing a show of scholarship from Lord Coke in *Heydon's Case, supra*, I should call such reasoning a "subtle invention" sacrificing the *bonum publicum* for the *commodum privatum*.

The practical implications of the majority's interpretation are not very wholesome. It seems to mean that if the wily representative of any group or interest seeking special

preference can get his foot in the door by pushing through the Legislature a bill which can be read or explained in two different ways, he may then rely upon the courts fully to open the door.

Nor does legal precedent seem to favor such an interpretation. So far as I can ascertain, it is firmly established law that all ambiguities in such "public grants" as we have here are to be construed against the beneficiaries of the special favors. See *Southerland, Statutory Construction,* (*3rd Ed.*) *Horack, Vol. 3, Ch.* 64; *Chenango Bridge Co. v. Binghamton Bridge Co.,* 3 *Wall.* 51, 70 *U.S.* 51, 18 *L.Ed.* 137. Tax exemption statutes, the particular illustration used in the majority opinion, appear not to differ materially from other forms of public grants. A typical statement of the rule in such cases was uttered by Judge Avery, sitting in the Connecticut Supreme Court of Errors, in *Town of Woodstock v. The Retreat, Inc.,* 125 *Conn.* 52, 3 *A.2d* 232, 233:

> "Taxation is an act of sovereignty, to be enforced, so far as it conveniently can be, with justice and equality to all. Exemptions, no matter how meritorious, are of grace, and must be strictly construed. They embrace only what is strictly within their terms."

See also 53 *C.J.S., Licenses,* § 31, *page* 603, and *Southerland, Statutory Construction,* (*3rd Ed.*) *Horack,* § 6409.

But there is yet another reason why the interpretation urged by appellant is difficult to accept. If we are to construe the third exception as appellant would have us do, the fourth one is an embarrassment. There was no need for the fourth exception if the third already applied to all the incidental espects of an industrial enterprise. In an effort to avoid this obvious overlapping, appellant says that the third exception applies only to such activities as are "necessary to and indissoluble from" the industrial operations. Hence, it is argued, an office building would be exempt under "3," but a club for employees would not be, or would not certainly be.

But what is the source of this criterion of indissolubility? So far as I can determine, it is not sponsored in any

book. Such a so-called "test," indeed, will not itself bear scrutiny. What is or is not indispensable to a business is not only without the prestige of previous recognition as a determinative standard, but it lacks any quality of objective certainty. What is necessary to a business is a relative, subjective thing, so that its portrayal in tones of absolute black and white is oversimplification. What one man would call indispensable to an industry another equally shrewd industrialist would denounce as folly. The appellant could perhaps survive, albeit under some handicap, without owning this or any other office building. Perhaps it could in some fashion manage without a legal department, pensions for employees, or any of several other entities or measures now in use. Yet all these items are probably regarded by somebody as "indispensable." But as a matter of fact, a clubhouse for employees and an office building, as corporate property, are only different in a superficial and relative sense; they must have this vital characteristic in common, that they are designed to promote the success of the company's business. Otherwise there is no excuse for their existence, and the board of directors would have no right to provide them. *Dodge v. Ford Motor Company*, 204 *Mich.* 459, 170 *N.W.* 668, 3 *A.L.R.* 413. To hold that a clubhouse for employees is not a necessary incident to a huge modern business concern would be a finding of fact difficult for courts and dangerous for boards of directors. See cases collected in 3 *A.L.R.* 443.

The majority opinion, in obedience to the principle requiring, if possible, that such a construction be applied as will give meaning to all parts of a statute, strives to establish some reason for the existence of the fourth exception in the face of a broad interpretation of the third one. It says, in summary, that the third and fourth exceptions were combined in order "to exempt all of the property of an industrial concern used in furtherance of its general business purposes * * *." But if the legislative purpose was truly so simple, why is it supposed that whoever drafted the statutes lacked the wit to say so? And why would two exceptions be

used if it were merely sought to except one thing? Now, if we take the narrow interpretation of "industrial," we see that the two exceptions become applicable to two things. Because an ambiguous word is included in a statute so as to require judicial construction, it does not follow that the statute as a whole was so poorly drawn that the ordinary rules of construction do not apply to it. This argument that the fourth exception was inserted simply to make sure that an item on the periphery of the third one would be excepted, assumes a degree of incompetence in the general draftsmanship of the statutes which I am not prepared to concede.

To the majority it seems illogical to suppose that the Legislature would have excepted some of the buildings of a corporation and not others. I fail to grasp the force of the judicial reasoning that if factories and facilities for the pleasure of employees are excepted, then offices must necessarily have been excepted as well. These are legislative considerations. If we were in the realm of pure logic, we should have been halted at the very beginning, where the decision was made to permit the building of properties without supervision as to the safety of their construction in order to insure that we shall have as many of such buildings as possible. If the very exceptions themselves create an inequity, as must eventually be acknowledged to be the case, the instances of inequality are simply multiplied if the coverage of the exceptions is extended.

Appellant and the majority make much of the supposed difficulty of enforcing the statutes if the narrow interpretation of the word "industrial" be adopted. The majority opinion gives several examples of problems which it is said would prove most troublesome. It is permissible to look at the alternative consequences in aid of an interpretation where, as here, the statute itself is ambiguous. If one alternative is absurd and the other sensible, the courts assume that the Legislature intended the sensible result. 50 *Am.Jur.*, § 372. But that test is of no service here, for, although there might be annoyances under a narrow interpretation, there is in-

justice under the broad one. An absolutely identical office building in a similar location, but owned by an insurance company or bank, for example, would be covered, while this one would be exempt. Obviously the courts, in attempting to reconstruct the legislative intent, should shrink from an interpretation which would result in that type of discrimination. Under our system of jurisprudence justice is not lightly surrendered to convenience.

Because a law will not be easy to enforce, it does not follow that it is, therefore, not the law, nor that if it is enforced, such enforcement will be likely to be "arbitrary and capricious." One has only to look at the federal Fair Labor Standards Act to see how short its career would have been if such a consideration had been given weight. At the last count there were fifteen variously worded general classes of exemptions from the coverage of that law. Yet the courts have consistently and generally applied the law as liberally as it could be applied, and construed the exceptions as narrowly as possible.

Nor has any difficulty of enforcing this law been suggested which is more serious than problems constantly arising in the field of municipal zoning. In zoning regulations a distinction is commonly made between "commercial" and "industrial" buildings. The distinctions there are usually based upon differences in the construction or use of the buildings in question, rather than on differences in the manner in which the owners make their money. So far, however, the difficulties of administration of zoning laws, though great, have not been found to be insurmountable.

For separate and independent reasons, therefore, to which, in my view of the matter, no sufficient answer has been given, I consider that we are here bound to construe the word "industrial" in its narrow sense. In my opinion the judgment of the Court of Chancery should have been affirmed.